# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

BETTY J. REARDON,
      Plaintiff,

vs.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,
      Defendant.

Civil Action No. 1:05-cv-178

**REPORT AND
RECOMMENDATION**
(Dlott, J.; Hogan, M.J.)

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et. seq. ("ERISA"). Plaintiff asserts an ERISA claim for benefits under 29 U.S.C. § 1132 (a)(1)(B), arguing that she is entitled to long-term disability benefits due under the terms of her employer-provided group long-term disability insurance plan. This matter is before the Court on the parties' cross-motions for judgment on the administrative record (Docs. 33, 37), and their respective opposing and supporting memoranda. (Docs. 38, 39, 40).

## PROCEDURAL BACKGROUND

Plaintiff was employed as a data entry clerk/administrative assistant at the C.W. Zumbiel Company for over thirty years. In 1997, she began experiencing back and neck problems. She was diagnosed and treated for degenerative disc disease, osteoarthritis, and fibromyalgia over the next several years. In August 2002, plaintiff ceased working and applied for long-term disability benefits through her employer's benefits provider, Prudential Insurance Company of America ("Prudential"). Prudential denied plaintiff's claim for benefits under the group long-term disability plan (the "Plan") on April 17, 2003, finding that her "medical conditions would not prevent [her] from performing the material and substantial duties of [her] regular occupation."

(*See* Administrative Record filed by Prudential on 11/1/05 ("AR"), 4/13/03 Prudential Ltr. at AR 000102). Plaintiff appealed the decision and in June 2003, Prudential denied the appeal. (6/05/03 Prudential Ltr. at AR 000104). Plaintiff appealed a second and third time. Both appeals were denied by Prudential. (9/16/03 and 9/02/04 Prudential Ltrs. at AR 000107 and 000111; AR 000064-66). Plaintiff then filed the instant lawsuit alleging a wrongful denial of benefits under the Plan. (Doc. 1).

## MEDICAL AND VOCATIONAL EVIDENCE

In October 1997, plaintiff was referred by her primary physician for back and neck pain to orthopedic surgeon Dr. Michael L. Swank, M.D. Upon examination, Dr. Swank found tenderness over her fibular collateral ligament and no focal neurologic deficits. (AR 000317). Dr. Swank's impression was degenerative disc disease and recommended physical therapy and medication. *Id*.

An MRI study of the cervical spine in June 1998 showed well-maintained alignment, a mild reversal of the normal cervical lordosis, no canal or foraminal stenosis, and no compressive pathology, but showed a few tiny central disc protrusions at C4-C5, C5-C6, and C6-C7. (AR 000311)[1]. An April 1999 MRI of the lumbar spine revealed "degenerative loss T2 signal loss of the L2-3 and L3-4 discs and more pronounced loss of height and desiccation of the L5-S1 disc[s]" as well as a "small central protrusion at the L5-S1 disc and minimal concentric bulging of the L2-3 and L3-4 discs without definite associated nerve root impingement." (AR 000303).

---

[1]Plaintiff's brief indicates that in May 1998, she was seen by Dr. Jeffery Stambough, an orthopedic surgeon, who diagnosed degenerative disc disease and fibromyalgia in the neck region, citing to AR 000311-000313. The Court's review of these record pages do not reveal a report or examination by Dr. Stambough, but rather the MRI study of June 1998 and a physical therapy referral by Dr. Stambough.

A May 1999 MRI of the cervical spine revealed "reversal of normal cervical lordosis," disc protrusions at the C2-3 and C3-4 levels, a spur formation at the C3-4 level, "mild concentric disc bulge at the C4-5 level with mild flattening of the [spinal] cord" and "widely patent neural foramen throughout the cervical region." (AR 000304).  In October 1999,  Dr. Crystl Willison performed a lumbar fusion at L3-4 and L5-S1. (AR 000357).

In May 2001, plaintiff saw Dr. Jesse Portugal, a physical medicine and rehabilitation specialist, for her neck, hip, and knee pain. (AR 000357).  Dr. Portugal noted neck and back pain upon examination, but full range of motion of the cervical spine and no cervical paraspinal spasms. (AR 000358).  Examination of the back revealed lateral bending and rotation were functionally full, but no extension secondary to pain.  Sensory examination showed reduced pin prick and light touch diffusely throughout the left arm and left leg.  Plaintiff had fair pelvic mobility and good toe and heel walk. (AR 000359).  Dr. Portugal diagnosed myofascial pain involving the upper trapezius and levator scapulae, advised a pelvic x-ray and an electrodiagnostic study of plaintiff's hands to rule of peripheral neuropathy, and recommended physical therapy. (AR 000360).

In his examination of June 1, 2001, Dr. Portugal noted that x-rays of plaintiff's left hip revealed sclerosis and narrowing of the hip joints with evidence of degenerative changes. (AR 000354).  On examination, plaintiff exhibited normal tone, no gross effusion or swelling, and no increase in pain upon internal and external rotation of the hips bilaterally. *Id*.  Dr. Portugal's impression was myofascial pain with history of osteoarthritis and cervical disc disease.

On June 28, 2001, Dr. Portugal reported that a previous electrodiagnostic study revealed no evidence of peripheral neuropathy and no radiculopathy.  X-rays showed mild degenerative changes of the hips bilaterally.  Dr. Portugal noted evidence of cervical protrusions by MRI,

recommended a muscle stimulator to improve blood flow, decrease pain, and improve functional mobility and endurance, and prescribed Skelaxin 400 mg. (AR 000351).

Dr. Salem Foad, a rheumatologist, reported to plaintiff's treating internist that his examination of plaintiff on January 17, 2001 revealed tenderness in the suprascapular areas and medial scapular border and cervical paraspinal areas bilaterally. (AR 000263). Her neck, shoulders, and hips were not limited, but flexion of the lumbar spine was limited to 70 degrees. *Id*. Dr. Foad also reported tenderness in the lower back at L4-L5, but no swelling of the fingers, wrists, elbows, knees, ankles or feet. X-rays showed slight narrowing of C5-6 with mild spurring and posterior subluxation of C5 in relation to C4. X-rays of the lumbar spine showed screws at L3-L4 and L5-S1 and narrowing of the disc space. Dr. Foad's impression was osteoarthritis, degenerative disc disease in the cervical spine and lumbar spine, and fibromyalgia. *Id*. Plaintiff was treated with steroid injections to trigger points in the scapular area in both shoulders. Plaintiff was also instructed in an exercise program, encouraged to walk, and prescribed medication. *Id*.

Plaintiff has been treated by internist Dr. Robert Gerke, M.D., since 1997 for osteoarthritis, degenerative joint disease, fibromyalgia, and other conditions. (AR 000150). Dr. Gerke's progress notes from January 2000 through July 2002 show treatment for fibromyalgia, cervical disc disease, degenerative joint disease, and osteoarthritis. (AR 000330-000334). In addition, Dr. Gerke has referred plaintiff to various specialists for her conditions, including orthopedists and rheumatologists. (AR 000150). On July 30, 2002, plaintiff informed Dr. Gerke that she "wants disability due to DJD & osteoarthritis." (AR 000334). A progress note dated June 11, 2003 indicates plaintiff has not worked since August 2002 and cannot sit for more than 2 hours. (AR 000246). Physical examination showed bilateral knee crepitus, right greater than left, bilateral shoulder crepitus, multiple trigger points in the back, a stiff gait, and swelling of

4

both hands. *Id*.  The impression was fibromyalgia and degenerative joint disease. *Id*.  Dr. Gerke, in a letter dated July 1, 2003, reported that plaintiff's fibromyalgia causes constant neck and back pain. (AR 000243).  He also reported that plaintiff has difficulty sleeping and difficulty walking and standing due to hip and knee pain. *Id*.  Dr. Gerke stated that plaintiff's wrists and fingers hurt and swell, and that these ailments affect her job as a keyboard operator.  He reported that plaintiff is unable to sit or stand for prolonged periods of time and cannot do repetitive motions such as typing.  Dr. Gerke stated that plaintiff has had these problems since 1997, and has been seen by orthopedics and rheumatology. *Id*.  Her medications included etodolac, Ultracet, diazepam and Celexa.  Dr. Gerke opined that plaintiff cannot work secondary to these problems. (AR 000243).

On September 11, 2002, plaintiff was referred by Dr. Gerke to rheumatologist Dr. Michael Luggen for chronic neck and low back pain and increasing difficulty with her thumbs. (AR 000253).  On physical examination plaintiff had numerous trigger points in the back and chest; decreased mobility of the cervical spine, tenderness of the first carpometacarpal joints bilaterally with degenerative changes in both interphalangeal joints of her thumbs; swelling of both knees with tenderness in the right knee and some bony enlargement; normal ankles and MTPs; normal strength and sensation neurologically; and some suggestion of hyperreflexia in the bicep jerks bilaterally. (AR 000254).  X-rays showed degenerative disc disease at C5-C6. *Id*. Dr. Luggen agreed with the previous diagnoses of degenerative disc disease, fibromyalgia, and osteoarthritis. *Id*.  In a follow-up examination of September 17, 2002, Dr. Luggen reported limited motion of the cervical spine and trigger points. (AR 000252).  An MRI of the cervical spine showed no significant compressive lesions of nerve roots or spinal cord, but showed minor disc degeneration. (AR 000251, 000252).  Dr. Luggen assessed plaintiff's neck pain was

5

"probably multifactorial" and "suspect[ed] that there is a component of fibromyalgia as well as disc degeneration causing the pain." (AR 000252).

In July 2003, Dr. Gerke referred plaintiff to Dr. David Taylor, an orthopedist, for swelling in her right knee.  Dr. Taylor ordered an MRI which showed a tear in the posterior horn of the medial meniscus. (AR 000240, 000274).  Dr. Taylor performed a right knee arthroscopy on July 24, 2002, and post-operatively plaintiff did well. (AR 000273).

In May 2004, plaintiff underwent a Functional Capacities Evaluation by Rick Wickstrom, a Licensed Physical Therapist, Certified Professional Ergonomist (CPE), and Transitional Work Developer (TWD).  This evaluation involved the physical testing of plaintiff's abilities to move, to lift, to walk, to carry, and other basic functions. (AR 000142).  The results of most of these tests were in the "ABnormal" range and nearly all of the "capabilities" tests revealed that plaintiff's abilities were not a "job match." (AR 000142-143).  Mr. Wickstrom determined that plaintiff could not perform even sedentary work demands "because she must lie down periodically throughout the day to obtain symptom relief." (AR 000143).  Mr. Wickstrom also reported that plaintiff's "balance is unsteady and she should use a rail for support when climbing up or down steps.  She has to spend most of her seated time using a recliner or ergonomic chair to increase seated tolerance." (AR 000143).  Mr. Wickstrom's report concluded that plaintiff "is permanently and totally disabled as a result of her health conditions" and "totally disabled from work effective 8/12/02." *Id*.  Plaintiff's treating physician, Dr. Gerke, agreed with and signed onto this assessment. (AR 000144).  Dr. Gerke reported that "[i]t is my opinion to a reasonable degree of medical certainty that Betty Reardon's condition as of August 9, 2002 and thereafter was the same in all material respects as her condition described in Rick Wickstrom's report." (AR 000150).

6

An "Employability Assessment" of plaintiff was conducted by Penny Carr, M. Ed., a Certified Rehabilitation Counselor, Certified Case Manager, SSA Vocational Expert, and I.C. Vocational Assessor.  On July 7, 2004, Ms. Carr reported that plaintiff was neither able to return to her duties at C.Z. Zumbiel Co., nor do any other work in the national economy and recommended she be paid disability benefits. (AR 000149).  Ms. Carr's conclusions were premised on an hour and a half personal interview with plaintiff, a review of plaintiff's medical records, and a review of Mr. Wickstrom's report.  Ms. Carr's report focused on plaintiff's job as it was actually performed in the workplace.  Based upon her interview with plaintiff and a review of a job description provided by plaintiff–which had been approved by her supervisor and used in her personnel review process for several years–Ms. Carr determined that plaintiff's work was more taxing than the typical "sedentary" job as an administrative assistant. (*See* AR 000146-149B).  While the majority of plaintiff's work involved sedentary computer data entry, a portion of her tasks required plaintiff to walk 200 feet down the hall from her desk to pull a large Factory Order Binder, weighing 12 to 25 pounds, from a bookcase, carry the binder back to her desk, make the appropriate manual notations, and carry the binder back down the hall to re-shelve it. *Id.*  Plaintiff was required to do this as many as five times a day.  Ms. Carr reported that "the

Attending Physicians Statement completed on 1/23/03 by Dr. Gerke indicated restrictions of no lifting, no prolonged sitting/standing" and that "[h]er job required that she do all these functions." (AR 000147).  Ms. Carr also noted that Dr. Gerke reported that plaintiff's "fibromyalgia causes constant neck and back pain" and that "her wrists and fingers hurt and swell," adversely affecting her job as a keyboard operator. (AR 000147).  Ms. Carr also noted that Dr. Gerke reported that plaintiff "is unable to sit and stand for long periods of time and cannot do repetitive motions such as typing." *Id*.  Ms. Carr determined that based on these

limitations, plaintiff "would not be able to return to her job as she was required to perform it or any clerical work that required typing." (AR 000148). Ms. Carr further noted that the limitation on repetitive hand motions "was ignored in the letters from Prudential Financial." *Id*.

A Medical Source Statement by Dr. Gerke indicated plaintiff is limited to lifting less than 10 pounds occasionally and able to walk less than 4 hours per workday, and less than one hour without interruption. (AR 000135-36). Dr. Gerke also reported that plaintiff has frequent pain in her back and neck, and cannot stand and walk for prolonged periods. (AR 000137). Dr. Gerke opined that plaintiff's limitations are normally expected from the type and severity of her diagnoses, and she would need to miss 10-14 days of work per month due to her physical problems. (AR 000138).

## STANDARD OF REVIEW

In a denial of benefits action brought under § 1132(a)(1)(B), the Court must base its review of the merits solely upon the underlying administrative record; the Court may not consider any evidence that was not presented to the Plan administrator. *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir. 1998)(Gilman, J., concurring). The Court "may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision." *Id*. The Sixth Circuit has determined that summary judgment procedures are inconsistent with the appropriate standard of review for recovery of benefits claims under ERISA. *Id*. Instead of using the summary judgment mechanism, the Court must review the administrative record applying either a *de novo* or an arbitrary and capricious standard of review, as appropriate, and render a decision on the merits

by determining whether the denial of benefits was proper under the terms of the Plan. *Id.* at 619-20; *Smith v. Aetna U.S. Healthcare*, 312 F. Supp.2d 942, 949 ( S.D. Ohio Mar. 29, 2004).

A beneficiary may challenge an ERISA plan administrator's decision to deny benefits under 29 U.S.C. § 1132(a)(1)(B). When a beneficiary raises such a challenge, the Court must review the administrator's decision under a *de novo* standard, unless "the benefit plan in question gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan grants discretionary authority to the administrator, the Court must apply the highly deferential arbitrary and capricious standard to its review of the benefits decision. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996). While the plan need not include "magic words" such as the term "discretionary" or some other specific terminology, in order to vest the plan administrator with discretion, the grant of discretionary authority must be "clear" in order to trigger the arbitrary and capricious standard of review. *Hoover v. Provident Life & Acc. Ins. Co.,* 290 F.3d 801, 807 (6th Cir. 2002); *Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 555 (6th Cir. 1998)(*en banc*).

Under an arbitrary and capricious standard, the Court must affirm the administrator's decision if the record evidence establishes a reasonable basis for the decision. *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693-94 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990). Under the *de novo* standard of review, however, the Court must consider "the proper interpretation of the plan and whether an employee is entitled to benefits under it" based solely on the record that was before the administrator. *Perry v. Simplicity Engineering*, 900 F.2d 963, 966-67 (6th Cir. 1990). *See also Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372, 1376 (6th Cir.

9

1996); *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1372 (6th Cir. 1994).  *De novo* review

simply means a determination "whether or not the Court agrees with the administrative decision

based on the record that was before the administrator." *Perry*, 900 F.2d at 966.

> The Prudential Plan provides in pertinent part:
>
> You are disabled when Prudential determines that:
>
> •  you are unable to perform the **material and substantial** duties of your **regular occupation** due to your **sickness** or **injury**; and
>
> •  you have a 20% or more loss in your **indexed monthly earnings** due to that **sickness** or **injury**.
>
> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fit by education, training or experience.

(AR 000022)(emphasis in the original).

Plaintiff argues that *de novo* review is the appropriate standard of review because the

language of the Plan contains no clear grant of discretion to the Plan administrator.   Defendant,

in contrast, argues that the "Prudential determines" language followed by the conditions

considered by Prudential conveys discretionary authority.

While numerous courts throughout the country have addressed the issue of whether the

Plan language "when Prudential determines" confers discretionary authority on the Plan

administrator, the Sixth Circuit has not done so in a published opinion.  However, in a recent

unpublished opinion, the Sixth Circuit addressed language nearly identical to that in the instant

Plan.  In *Noland v. Prudential Ins. Co. of America*, 2006 W.L. 1526087 (6th Cir. June 2, 2006),

the Plan at issue provided that benefits are granted only "when Prudential determines that all of

these conditions are met. . . ."  The *Noland* Court held:

> Such language reserves discretionary authority to Prudential. *Cf. Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (en banc) (holding that language stating that the insurer "shall have the right to require as part of the proof of claim satisfactory evidence" conferred discretion); *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) (finding that language stating that claimant must submit "satisfactory proof of Total Disability to us" conferred discretion); *see also Green v. Prudential Ins. Co. of Am.*, 383 F. Supp.2d 980, 990-91 (M.D. Tenn. 2005) (finding this exact language to confer discretion so as to trigger the arbitrary and capricious standard of review); *Adams v. Prudential Ins. Co. of Am.*, 280 F. Supp.2d 731, 736 (N.D. Ohio 2003) (same; and cases discussed therein).

*Noland*, 2006 WL 1526087, *4.

Plaintiff contends that the Sixth Circuit's unpublished decision in *Noland* is not binding on this Court, *see United States v. Barnes*, 278 F.3d 644, 648 n. 1 (6th Cir. 2002), and that the Court should follow the cases finding the "Prudential determines" language does not confer discretion. *See, e.g., Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635 (7th Cir. 2005)*; Neumann v. Prudential Ins. Co. of America*, 367 F. Supp.2d 969 (E.D. Va. 2005); *Heinrich v. Prudential Ins. Co. of America*, 2005 WL 1868179 (N.D. Cal. July 29, 2005)[2]. (Doc. 33 at 3-5). Examination of those cases, as well as the cases cited in footnote 3 of plaintiff's brief (Doc. 33 at 4 n.3) reveals that they are all outside of the Sixth Circuit and many rely, in part, on a rationale explicitly disagreed with by the Sixth Circuit in *Perez*. For example, in *Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635 (7th Cir. 2005), the Seventh Circuit held that plan language identical to the instant case did not confer discretionary authority on the plan administrator and that the proper standard of review was *de novo*. The *Diaz* Court relied on the Seventh Circuit's decision in *Herzberger v. Standard Ins. Co.*, 205 F.3d 327 (7th Cir. 2000), stating, "In keeping

---

[2]Relying on Ninth Circuit authority holding that an "allocation of decision-making authority ... is not, without more, a grant of discretionary authority in making those decisions." 2005 WL 1868179, *7, quoting *Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees of Transferred GE Operations*, 244 F.3d 1109, 1112-13 (9th Cir. 2001).

with *Herzberger*, we conclude that the critical question is whether the plan gives the employee

adequate notice that the plan administrator is to make a judgment within the confines of pre-set

standards, or if it has the latitude to shape the application, interpretation, and content of the rules

in each case.  The Prudential Plan here falls under the former category, and thus the district court

should have reviewed its application *de novo*." *Diaz*, 424 F.3d at 639-40.  The *Diaz* Court

explained:

> *Herzberger* took a significantly different approach when it held that a requirement
> that the administrator determine eligibility, or that proof or satisfactory proof
> must be tendered before benefits will be given, does not give the employee
> adequate notice that 'the plan administrator is to make a judgment largely
> insulated from judicial review by reason of being discretionary.' 205 F.3d at 332.

*Diaz*, 424 F.3d at 638-39.

Yet, the Seventh Circuit in *Herzberger* rejected the approach used by the Sixth Circuit in

*Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555-58 (6th Cir. 1998) (en banc).  *See Herzberger*,

205 F.3d at 329-30.  The Sixth Circuit in *Perez* held that where the administrator was given "the

right to require as part of the proof of claim satisfactory evidence . . . that the claimant has

furnished all required proofs for such benefits," such language vested in the plan administrator

the discretion to determine eligibility for benefits. 150 F.3d at 555-557.  In contrast, *Herzberger*

held that "the mere fact that a plan requires a determination of eligibility or entitlement by the

administrator, or requires proof or satisfactory proof of the applicant's claim, or requires both a

determination and proof (or satisfactory proof), does not give the employee adequate notice that

the plan administrator is to make a judgment largely insulated from judicial review by reason of

being discretionary." *Herzberger*, 205 F.3d at 332.  *See also Hall v. Life Ins. Co. of North

America*, 151 F. Supp.2d 831, 834 (E.D. Mich 2001) ("The *Herzberger* court . . . simply believed

that *Perez* was wrongly decided.). This Court is constrained to follow the en banc decision of *Perez* and, to the extent plaintiff relies on cases which in turn rely on *Herzberger*, the undersigned declines to follow the cases cited by plaintiff.

In addition to the Sixth Circuit's unpublished decision in *Noland,* several district courts within the Sixth Circuit have held that the plan language "when Prudential determines" gives sufficient discretionary authority to Prudential to trigger application of the arbitrary and capricious standard of review. *See, e.g., Green v. Prudential Ins. Co. of America*, 383 F. Supp.2d 980, 990-91 (M.D. Tenn. 2005); *Adams v. Prudential*, 280 F. Supp.2d 731, 734, 736 (N.D. Ohio 2003); *Knapp v. Prudential Ins. Co.*, No. 4:02-CV-130, 2003 U.S. Dist. LEXIS 6235 (W.D. Mich. April 4, 2003); *Sparkman v. ATC Healthcare Services, Inc.'s Long Term Disability Benefit Plan*, Case No. 3:01-0266 (M.D. Tenn. 2002). Courts outside of the Sixth Circuit, while not binding upon this Court, have likewise held this Prudential policy language confers discretionary authority. *See Roach v. Prudential Ins. Brokerage, Inc.,* 62 Fed. Appx. 294, 299, 2003 WL 1880641 (10th Cir. 2003); *Heim v. Prudential Ins. Co. of America*, 2006 WL 382147, *10 (E.D. Va. Feb. 16, 2006); *Chapman v. Prudential*, 267 F. Supp.2d 569, 577 (E.D. La. 2003). *See also Rupert v. Prudential Ins. Co.*, 2006 WL 910405, *7 (M.D. Pa. April 7, 2006) (the language when "Prudential determines" provides Prudential with the discretionary authority to determine disability); *Mitchell v. Prudential Health Care*, 2002 WL 1284947, *7 (D. Del. June 10, 2002)(usual meaning of the word "determines" implies the exercise of discretion and "a determination is reached only after deliberation of some sort. The ability to think or deliberate prior to making a decision is the touchstone of discretion."). The weight of the authority within the Sixth Circuit favors a finding that the language "when Prudential determines" grants

discretion to the plan administrator and persuades the undersigned that the proper standard of review in this case is arbitrary and capricious.

Under the arbitrary and capricious standard of review, this Court must determine whether Prudential's denial decision "is the result of a deliberate, principled reasoning process and . . . is supported by substantial evidence." *Glenn v. Metlife*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). The Court must determine whether Prudential's decision was rational in light of the Plan's provisions. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003); *Shelby County Health Care Corp. v. Southern Council of Industrial Workers Health and Welfare Trust Fund*, 203 F.3d 926, 933-34 (6th Cir. 2000). The plan administrator's decision will be upheld if the administrative record can support a "reasoned explanation" for the decision. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005) (citing *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). The "explanation must be consistent with the quantity and quality of the medical evidence that is available on the record." *Moon*, 405 F.3d at 381 (internal quotation and citation omitted).

The arbitrary and capricious standard of review is not a mere rubber stamp of the plan administrator's decision. *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). As the Sixth Circuit stated in *McDonald*:

> [T]he district court had an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence--no matter how obscure or untrustworthy--to support a denial of a claim for ERISA benefits.

14

347 F.3d at 172.  "Deferential review is not no review, and deference need not be abject."

*McDonald*, 347 F.3d at 172 (internal quotation and citation omitted).  In determining whether

Prudential's denial decision was arbitrary and capricious, the Court is limited to reviewing the

materials in the administrative record, *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433-34 (6th

Cir. 1998), and the evidence of bias offered by plaintiff in support of her procedural challenge to

the administrator's decision. *Wilkins*, 150 F.3d at 619.[3]


## OPINION

In support of its decision to deny plaintiff's claim for long-term disability benefits,

Prudential contends that plaintiff's own physicians' records support the decision to deny

plaintiff's claim; that Prudential acted reasonably in relying on its independent medical expert,

Dr. Joel Moorhead; that Prudential was not required to give deference to plaintiff's treating

physician's opinion; and that an alleged conflict of interest did not affect Prudential's denial

decision.

Plaintiff argues that Prudential improperly required her to show a change in her medical

condition, which is neither a Plan requirement and contrary to public policy; that every

examining physicians' opinion and two vocational experts support her claim for disability; and

that improper bias and a conflict of interest in the selection of Dr. Moorhead, a former Prudential

employee, affected Prudential's decision to deny benefits.

Plaintiff's September 2, 2004 denial letter "should be the principal point of reference in

our review of a challenged denial of benefits." *University Hosps. of Cleveland v. Emerson Elec.*

---

[3]By Order dated December 21, 2005, the Court permitted plaintiff to conduct limited discovery in this case. (Doc. 21).

*Co.,* 202 F.3d 839, 849 n. 7 (6th Cir. 2000).  Prudential's letter denying plaintiff's third appeal

states in relevant part:

> The Prudential's Appeal Committee has determined that the decision to deny Ms.
> Reardon's LTD claim was appropriate and therefore we have upheld that
> decision.  Physician review of Ms. Reardon's claim supports that her treating
> physician's opinion, as well as that of the physical therapist who performed her
> FCE, is based on her self-reported symptoms and not on objective physical
> examination findings or findings on diagnostic imaging.  Ms. Reardon has had
> normal EMGs/NCVs of the neck and upper extremities, without any evidence of
> neuropathy, myopathy, or radiculopathy.  Abnormalities on MRI testing reveal no
> evidence of neural compression, spinal cord compromise, or foraminal narrowing.
> In addition, the most recent cervical MRI performed in 2002 reveals no changes
> from the minimal findings noted in her previous cervical MRI performed in 1999.
>
> While Ms. Reardon may experience pain from her conditions, medical
> documentation supports that she has the physical capacity to perform sedentary to
> light duty work.  Since her job as an Administrative Assistant falls within this
> range, disability is not supported.  Although she reports neck and back pain, it is
> noted that Ms. Reardon has a four to six year history of neck/back complaints
> with which she has worked in the past.  Medical documentation in [the] file,
> which includes Ms. Reardon's most recent imaging results, supports that there has
> been no change in her neck/back condition that would prevent sedentary to light
> duty work.  While Ms. Reardon carries the diagnoses of osteoarthritis,
> degenerative disc disease and fibromyalgia, we maintain that she is not physically
> disabled from performing the duties of her regular job duties.

(AR 000066).

　　　　Prudential does not dispute that plaintiff suffers from degenerative disc disease,

osteoarthritis, and fibromyalgia.  All of Ms. Reardon's examining doctors confirm the underlying

medical bases for her pain and limitations.  Plaintiff's treating physician, based on his seven-year

treatment of Ms. Reardon, and in conjunction with the information gleaned from his referrals to

and consultation with specialists in orthopedics and rheumatology, concluded that plaintiff is

unable to perform the walking, sitting and lifting requirements for sedentary work.  In addition,

Dr. Gerke reported that plaintiff's wrist and finger impairments affect her ability to perform the

keyboard functions of her job. Examining vocational expert Wickstrom assessed that plaintiff is unable to perform sedentary work based on his examination, and Ms. Carr's Employability Assessment concluded plaintiff is unable to return to her former work or other work in the national economy. Despite the medical and vocational evidence indicating plaintiff is disabled, Prudential relied on the singularly contrary opinion of Dr. Moorhead, a former Prudential employee who arrived at his opinion not upon his examination of plaintiff, but rather upon his review of the administrative record. Several factors persuade the Court that Prudential's denial of benefits based on Dr. Moorhead's contrary opinion was arbitrary and capricious. For the reasons more fully explained below, the Court finds that Prudential's denial is based on an unwarranted assumption, a selective review of the administrative record which ignores the countervailing objective and clinical evidence supporting plaintiff's disability, and the opinion of a biased medical reviewer.

### I. Change in Medical Condition

Prudential's denial decision was not rational to the extent it required Ms. Reardon to prove a change in her medical condition before she could be found disabled. Prudential assumed that because plaintiff had worked with her impairments in the past and there was no change in her condition, she is not precluded from performing sedentary to light duty work and therefore not disabled. The requirement that plaintiff provide proof that her medical condition worsened is not mandated under either the Plan or caselaw.

First, the Plan does not require a "change of conditions" to qualify for total disability. *See Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp.2d 726, 736 n.5 (S.D. Ohio 2001) (Sargus, J). The Plan requires that the insured be unable to perform the material and substantial

17

duties of his or her regular occupation due to sickness or injury and have a 20% or more loss in indexed monthly earnings due to that sickness or injury. (AR 000022).  There is no requirement that plaintiff demonstrate a change in her condition which precipitated the cessation of work.  If plaintiff meets the Plan requirements, she should be found disabled. *Ebert*, 171 F. Supp.2d at 736 n.5.  Prudential's reliance on the lack of a change in plaintiff's medical condition is therefore not rational based on the Plan language.

Second, the fact that plaintiff worked in spite of her impairments does not mean she is not disabled from working full time.  Where a plan member may have pushed herself to work despite her impairments, but cannot now maintain that effort, disability is not precluded in the absence of a showing that her medical condition changed for the worse.   The fact that plaintiff continued to work for a period of time in spite of the pain and limitations caused by her medical conditions does "not prevent her from claiming long-term disability, if she qualifies for such under the Plan." *Ebert*, 171 F. Supp.2d at 736 n.5.  The argument waged by Prudential in this case was rejected by the Seventh Circuit in *Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003).  In *Hawkins*, the insurer argued that because the claimant had fibromyalgia for seven years while working, he could not be disabled without proof that his condition worsened. *Id*. at 918.  The *Hawkins* court was not persuaded that a change in condition was a prerequisite to a finding of disability:

> This would be correct were there a logical incompatibility between working full time and being disabled from working full time, but there is not.  A desperate person might force himself to work despite an illness that everyone agreed was totally disabling.  Yet even a desperate person might not be able to maintain the necessary level of effort indefinitely.  Hawkins may have forced himself to continue in his job for years despite severe pain and fatigue and finally have found it too much and given it up even though his condition had not worsened.  A

18

disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working.

*Hawkins*, 326 F.3d at 918 (citations omitted). *Accord Heffernan v. UNUM Life Ins. Co. of America*, 101 Fed. Appx. 99, 108 (6th Cir. 2004) (to infer that claimant's depression was inconsequential because she continued to work is not warranted and does not support a decision to deny benefits), citing *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 983 (7th Cir. 1999) ("Some disabled people manage to work for months, if not years, only as a result of superhuman effort, which cannot be sustained. . . . Reality eventually prevails, however, and limitations that have been present all along overtake even the most determined effort to keep working."); *Green v. Prudential Ins. Co. of Am.,* 383 F. Supp.2d 980, 992 (M.D. Tenn. 2005) (fact that plaintiff worked with similar complaints in the past does not lead to the conclusion that she is not disabled); *Crespo v. Unum Life Ins. Co. of America*, 294 F. Supp.2d 980 (N.D. Ill. Dec. 18, 2003) (same).

In this case, Prudential justified the denial of plaintiff's claim because she "has a four to six year history of neck/back complaints with which she has worked in the past" and "there has been no change in her neck/back condition that would prevent sedentary to light duty work." (AR 000066). This case is analogous to *Hawkins*. Prudential denied long term disability benefits after plaintiff fulfilled her job duties through August 12, 2002, her last day worked, but then failed to show a demonstrable change in her medical conditions. As in *Hawkins*, Prudential's denial is based on the faulty assumption of "a logical incompatibility between working full time and being disabled from working full time." *Hawkins*, 326 F.3d at 918. Contrary to Prudential's assumption, the lack of a demonstrable change in plaintiff's condition may in fact indicate that plaintiff was medically eligible for disability benefits much earlier, but

19

nevertheless continued to work until she could no longer sustain the effort. To uphold such a basis for denial would effectively punish a claimant for her diligence in attempting to continue working with a disabling condition at a job she held for thirty years before seeking disability benefits. Prudential's assumption that a change in plaintiff's medical condition was a prerequisite to a disability finding is without support in the Plan language or caselaw and is one indication that Prudential's decision-making process was not rational.

## II. **Selective Review of Administrative Record**

Prudential also bases its denial decision on its conclusion that plaintiff's pain and limitations are not supported by objective medical evidence. Prudential discounts plaintiff's treating physician's opinion and the Functional Capacity Evaluation which conclude that plaintiff is disabled because they are allegedly based on plaintiff's self-reported symptoms and "not on objective physical examination findings or findings on diagnostic imaging." (AR 000066). Prudential cites to "normal EMGs/NCVs of the neck and upper extremities, without any evidence of neuropathy, myopathy, or radiculopathy" and "[a]bnormalities on MRI testing" which showed "no evidence of neural compression, spinal cord compromise, or foraminal narrowing." (AR 000066). Prudential also cites to "the most recent cervical MRI performed in 2002 [which] reveals no changes from the minimal findings noted in her previous cervical MRI performed in 1999." (AR 000066). The examination of this reason for Prudential's decision in the context of the record as a whole shows that it is not a reasonable explanation consistent with the "quantity and quality of the medical evidence," *McDonald*, 347 F.3d at 172, but rather on a selective review of the administrative record which supports a finding of arbitrary decision-making in this case.

For example, Prudential argues that plaintiff's treating physician, Dr. Gerke, opined that "Plaintiff was capable of a sedentary occupation, subject to the following restrictions: no lifting, sitting, or standing for prolonged periods." (Doc. 37 at 17).  Prudential states that Dr. Gerke, without justification, changed his position to further restrict plaintiff after the denial of plaintiff's second appeal. (AR 000373). (Doc. 37 at 17).

A review of the Attending Physician's Statement cited by Prudential shows that while the treating physician checked the response of "sedentary work" to the question of  "best describes work ability," Dr. Gerke also stated that Ms. Reardon's "Prognosis for Return to Function/Return to Work" was "poor" and left blank the portion of the form for describing the "Return to Work Plan." (AR 000372).  Prudential ignores these other findings on the Attending Physician's Report.  This Report, as a whole, does not indicate plaintiff is capable of sedentary work and Prudential's interpretation to the contrary is not reasonable.  Moreover, read in the context of Dr. Gerke's other reports which more fully explain Ms. Reardon's actual functioning and which were  made with the benefit of input from the rheumatologists and orthopedists to whom Dr. Gerke referred Ms. Reardon, it is clear that Dr. Gerke believes Ms. Reardon cannot perform sedentary work. (AR 000015, 000135-138, 000243).

Additionally, in its argument to this Court, Prudential "questions" plaintiff's description of her job duties, suggesting that plaintiff manufactured more strenuous job duties "at the eleventh hour" in order to bolster her claim of disability. (Doc. 37 at 16).  Yet, in determining plaintiff's administrative claim, Prudential, as well as Dr. Moorhead, accepted that plaintiff's job as an administrative assistant fell into the range of sedentary to light duty work, not merely sedentary as Prudential argues on appeal to the Court. (AR 000066, 000134).  In any event,

21

while plaintiff did state "in her first appeal letter that she sat for 40 hours a week doing

keyboarding" as pointed out in Prudential's brief (Doc. 37 at 16), Prudential's brief omits the

remainder of plaintiff's sentence and ignores the context in which the statement was made.  Ms.

Reardon's handwritten statement was not a description of her job duties, but rather an

explanation of why she can no longer work:

> I am in pain all the time with the osteoarthritis, fibromyalgia and arthritis in my
> wrist and fingers that I just cannot do my job anymore.  I have been doing this job
> for 31 ½ years, and the only time I can get any relief from the pain is to take my
> pain medication and lay down to rest.  The employer does not have a facility for
> that.  Sitting 40 hrs a week doing keyboarding *and all the other duties I had to do*
> was causing my condition to worsen.

(AR 000294)(emphasis added).  The snippet cited by Prudential in its brief does not accurately

represent plaintiff's job duties, especially in light of the job description provided by plaintiff and

utilized by her employer in 1998 which places the job in the sedentary to light category. (AR

000149A-149B).

 Nor is the Court persuaded that a laundry list of what diagnostic imaging does *not* show

makes Prudential's denial reasonable.  It is not enough to simply list various "normal" findings

of imaging studies while ignoring the abnormal findings to support its denial of benefits.  A

review of the entire administrative record in context reveals that Prudential's selective citation to

only the "normal" findings on diagnostic imaging studies ignored the objective abnormal

findings revealed by such tests as well as the clinical findings on examination which support

plaintiff's claim of disability from the combination of her degenerative disc disease,

osteoarthritis, and fibromyalgia.  For example, Dr. Moorhead acknowledges that a "[d]iscogram

on 7/27/99 showed concordant pain at L3-4" (AR 000133), the location of plaintiff's lumbar

fusion in 1999 (AR 000357), which is clearly objective evidence demonstrating a medically-

determinable condition for plaintiff's pain and limitations.  In addition, an MRI of the cervical spine from 1999 revealed "reversal of normal cervical lordosis," disc protrusions at the C2-3 and C3-4 levels, a spur formation at the C3-4 level, and "mild concentric disc bulge at the C4-5 level with mild flattening of the [spinal] cord." (AR 000304).  X-rays in June 2001 revealed left hip sclerosis and narrowing of the hip joints with evidence of degenerative changes. (AR 000354).  X-rays from September 2002 showed degenerative disc disease at C5-C6. (AR 000254).  A 2002 MRI of the cervical spine was significant for small osteopath disc complex at C5-C6 without canal stenosis or foraminal and minor disc degeneration. (AR 000251, 000252).  A right knee MRI in July 2003 showed a tear of the posterior horn of the medial meniscus. (AR 000274).  These diagnostic findings support an objective basis for plaintiff's pain and limitations.

Likewise, Dr. Luggen's September 2002 examinations, one month after plaintiff ceased working, provide clinical findings supporting an organic basis for plaintiff's symptoms.  Dr. Luggen's exams revealed "numerous trigger points" in the back and chest; decreased mobility of the cervical spine; tenderness of the first carpometacarpal joints bilaterally with degenerative changes in both interphalangeal joints of her thumbs; swelling of both knees with tenderness in the right knee and some bony enlargement; and some suggestion of hyperreflexia in the bicep jerks bilaterally. (AR 000254).  In addition, X-rays showed degenerative disc disease at C5-C6. *Id*.  Dr. Luggen opined that plaintiff's neck pain was "probably multifactorial" and "suspect[ed] that there is a component of fibromyalgia as well as disc degeneration causing the pain." (AR 000252).[4]  In addition, Dr. Gerke's physical examination showed bilateral knee crepitus, bilateral

---

[4]Prudential, in its arguments to this Court, persists in its selective citations to the record.  For example, Prudential argues that the physical findings of Dr. Luggen "do not support any physical impairment that prevented Plaintiff from fulfilling the material and substantial duties of her occupation." (Doc. 37 at 12).  In this regard, Prudential cites to a portion of Dr. Luggen's September 11, 2002 examination which suggests a completely "normal" exam:

shoulder crepitus, multiple trigger points in the back, a stiff gait, and swelling of both hands. (AR 000246).

While Prudential cites to the "normal" findings revealed by the diagnostic imaging tests, in the context of the entire administrative record such findings do not mean there is no physical reason for plaintiff's pain. To the contrary, the MRI and x-ray evidence cited above, as well as the clinical findings on examination by each of plaintiff's examining physicians, support the physicians' diagnoses of osteoarthritis, degenerative disc disease and fibromyalgia. "[T]he administrative record reveals that the present case is not one in which a claimant sought long-term disability benefits, based upon mere unconfirmed allegations of pain without any medical foundation." *Castle v. Reliance Standard Life Ins. Co.*, 162 F. Supp.2d 842, 855-56 (S.D. Ohio 2001). Plaintiff's doctors have identified medically determinable impairments supported by objective and clinical findings explaining the bases for plaintiff's pain and limitations.

In addition, to the extent Prudential rejected Dr. Gerke's opinion because it was allegedly "based on Ms. Reardon's self-reported symptoms and not on objective . . . findings," Prudential unreasonably required plaintiff to present objective evidence for a disease not diagnosable by objective tests, to wit: fibromyalgia. As plaintiff points out in her brief, not all disabling conditions are subject to diagnosis by objective means. (Doc. 33 at 13, citing *Rodriguez v. McGraw-Hill Cos. Long Term Disability Plan*, 297 F. Supp.2d 676, 679 (S.D.N.Y. 2004) (fibromyalgia qualified as "medically determinable" impairment under long-term disability plan

---

"Plaintiff 'appeared well' upon physical examination, and her neurological exam showed normal strength and sensation. A.R. 254. Dr. Luggen recommended physical therapy and scheduled a follow-up visit in two months. A.R. 252, 888. Plaintiff did not return." (Doc. 37 at 12-13). Prudential omits all of the significant clinical findings of decreased mobility, tenderness, swelling, and bony enlargement, as well as Dr. Luggen's assessment of degenerative disc disease, fibromyalgia, and osteoarthritis which are cited above.

notwithstanding absence of definitive objective test for its diagnosis); *Heffernan v. UNUM Life Ins. Co.*, 2001 W.L. 1842465 (S.D. Ohio 2001) (granting disability benefits on basis of depression). Fibromyalgia[5], an impairment with which plaintiff suffers, is one such condition. The Sixth Circuit has recognized that fibromyalgia is not amenable to objective diagnosis and that standard clinical tests are "not highly relevant in diagnosing fibrositis[6] or its severity." *Preston v. Secretary of Health and Human Services*, 854 F.2d 815, 817-820 (6th Cir. 1988). Other courts have likewise recognized that fibromyalgia can be disabling even in the absence of objectively measurable signs and symptoms. *See Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)(fibromyalgia is a "disabling impairment" that can qualify an individual for disability payments even though "there are no objective tests which can conclusively confirm the disease."); *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia."). *See also Clark v. Aetna Life Ins. Co.*, 395 F. Supp.2d 589, 610 (W.D. Mich. 2005); *Rodriguez v. McGraw-Hill Cos. Long Term Disability Plan*, 297 F. Supp.2d 676, 679 (S.D.N.Y. 2004).

---

[5]"[F]ibrositis [the term previously used for fibromyalgia] causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results--a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in fibrositis patients. The medical literature also indicates that fibrositis patients may also have psychological disorders. The disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men." *Preston v. Secretary of Health and Human Services*, 854 F.2d 815, 817-820 (6th Cir. 1988).

[6]Currently, the preferred term is fibromyalgia, rather than the older terms fibrositis and fibromyositis. *See* The Merck Manual (17th ed. 1999), p. 481. Fibromyalgia may be generalized or localized, *i.e.*, myofascial pain syndrome. *Id*.

Four of plaintiff's examining physicians did "medically determine" the presence of findings that support plaintiff's diagnosis of fibromyalgia. (AR 000354, Dr. Portugal; AR 000263, Dr. Foad; AR 000150, 000330-334, 000243, Dr. Gerke; AR 000254, Dr. Luggen). Two of these physicians, Drs. Foad and Luggen, are specialists in rheumatology, the specialty for diagnosing and treating fibromyalgia. *See Walker v. Barnhart*, 2005 WL 2323169, *17 (D. Mass. 2005). While some of their clinical findings are necessarily "based on Ms. Reardon's self-reported symptoms and not on objective . . . findings" due to the nature of fibromyalgia, the lack of objective findings to support the fibromyalgia diagnosis does not undermine the limitations ultimately imposed on plaintiff by her treating physician due to the *combination* of fibromyalgia, osteoarthritis, and degenerative disc disease. Where plaintiff's treating physician and specialists have diagnosed fibromyalgia, and the medical research indicates that there are a lack of objective tests to prove this condition, it was unreasonable for Prudential to require objective findings. *Preston*, 854 F.2d at 819. *See also Hawkins*, 326 F.3d at 919.

Moreover, Dr. Gerke provided an objective basis for his opinion of plaintiff's disability based not only on plaintiff's limitations from fibromyalgia, but on the limitations from her osteoarthritis and degenerative disc disease as well. He adopted the Functional Capacity Evaluation by Mr. Wickstrom and opined "to a reasonable degree of medical certainty that Betty Reardon's condition as of August 9, 2002 and thereafter was the same in all material respects as her condition described in Rick Wickstrom's report." (AR 000150). The Functional Capacities Evaluation involved the physical testing of plaintiff's abilities to move, lift, walk, carry, etc. (AR 000142). Plaintiff tested in the abnormal range for most of the tests and her abilities were not a "job match." (AR 000142-43). The Wickstrom evaluation concluded plaintiff was unable to

26

perform even sedentary work and that plaintiff was totally disabled as a result of her health conditions. (AR 000143).  While the opinion of Dr. Gerke may not be given "special weight" in the benefits determination, Prudential "may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician." *Evans v. Unumprovident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006).  Through its selective citation of "normal" objective findings, to the exclusion of pertinent objective and clinical findings which support Ms. Reardon's limitations based on the combination of her degenerative disc disease, osteoarthritis, and fibromyalgia, Prudential unreasonably failed to give full and fair consideration to plaintiff's claim.

### III. <u>Conflict of Interest</u>

Three other factors persuade the Court that Prudential's decision to deny disability benefits in this case was arbitrary and capricious.  First, Prudential is the decision-maker for the Plan under which plaintiff claims benefits as well as the payor of such benefits. (AR 000035). Where, as here, the employer or fiduciary "is authorized both to decide whether an employee is eligible for benefits and to pay those benefits[,][t]his dual function creates an apparent conflict of interest." *Glenn v. MetLife and Long Term Disability Plan for Associates of Sears, Roebuck and Company*, 461 F.3d 660, 665-66 (6th Cir. 2006).  The conflict of interest occurs because the company incurs a direct expense as a result of the allowance of a claim and benefits directly from the denial or discontinuation of a claim. *Killian v. Healthsource Provident Administrators*, 152 F.3d 514, 521 (6th Cir. 1998).  Considering Ms. Reardon's age, payment of the claim beyond the 24 month limitation period would be expensive for Prudential and thus, there exists an incentive for Prudential to deny the claim.  *See Calvert*, 409 F.3d at 292 ("Under such facts,

27

'the potential for self-interested decision-making is evident.'") (citation omitted).  This conflict

of interest is a relevant factor in considering whether Prudential's denial of benefits was arbitrary

and capricious. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Second, Prudential's conflict of interest is exacerbated because Dr. Moorhead, the

"independent" medical expert upon which it relied to deny benefits, was a former medical

director of Prudential who was hired by Prudential to review the file.  Plaintiff was permitted

discovery on the issue of Dr. Moorhead's alleged bias in the disability determination in this case.

Plaintiff has discovered statistical and other evidence of Dr. Moorhead's bias in favor of a non-

disability finding which serves the interests of Prudential.

"[P]hysicians repeatedly retained by benefits plans may have an incentive to make a

finding of 'not disabled' in order to save their employers['] money and preserve their own

consulting arrangements." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003)

(citation and quotation marks omitted).  The Sixth Circuit has acknowledged that "a plan

administrator, in choosing the independent experts who are paid to assess a claim, is operating

under a conflict of interest that provides it with a 'clear incentive to contract with individuals

who were inclined to find in its favor that [a claimant] was not entitled to continued [disability]

benefits.'" *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 507-508

(6th Cir. 2005) (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).  In

applying the arbitrary and capricious standard, this Court must factor this possible conflict of

interest into its decision. *Calvert*, 409 F.3d at 292.

In *Kalish*, the Sixth Circuit was unable to conclude that the defendant acted arbitrarily

and capriciously in crediting the opinion of the reviewing physician over that of the treating

physician where the plaintiff only offered conclusory allegations of bias and failed to "present any statistical evidence to suggest . . . [the reviewer] has consistently opined that claimants are not disabled." 419 F.3d at 508. Here, in contrast, plaintiff submits evidence showing that Dr. Moorhead was a medical director at Prudential from 1999 to 2002. (Doc. 33, Moorhead Depo. at 9). He still keeps in touch with his former colleagues at Prudential from time to time. (Doc. 33, Moorhead Depo. at 14-15). Moreover, Dr. Moorhead owns stock in Prudential which he acquired while employed at Prudential. (Doc. 33, Moorhead Depo. at 13). At the time of his file review Dr. Moorhead was a salaried employee of Emory University which received financial remuneration from Prudential for Dr. Moorhead's reviews. (Doc. 33, Moorhead Depo. at 75, 80). Dr. Moorhead estimated that of the 20 file reviews he conducted for Prudential since leaving its employ, in only one or two of the cases did he find the person's disability to be supported. (Doc. 33, Moorhead Depo. at 85).

Several factors raise an issue as to Dr. Moorhead's "independence" in this matter. Dr. Moorhead has a financial stake in the performance of Prudential through his ownership of Prudential stock. In addition, while paid a salary by Emery University, that salary was financed in part through Prudential funds. Out of the file reviews he has conducted, approximately 95% of the time he opined that claimants are not disabled. *Cf. Kalish*, 419 F.3d at 508 (where plaintiff failed to present evidence suggesting that reviewing physician consistently opined that claimants are not disabled). As the plan administrator, Prudential had a clear incentive to contract with a medical expert who was inclined to find in its favor that plaintiff was not entitled to benefits. *Calvert*, 409 F.3d at 292. An inference of bias in favor of Prudential is warranted given Dr. Moorhead's continued financial interest in Prudential, his previous and continuing ties

29

therewith, and his consistent opinions that claimants are not disabled.   Thus, Prudential's
decision to rely on Dr. Moorhead's report rather than the contrary opinions of plaintiff's treating
physician and vocation experts who unanimously and consistently found her to be disabled was
arbitrary and capricious.

Third, Prudential never sought an independent medical exam although the Plan
specifically reserved the right to conduct a medical examination of plaintiff. (AR 000022).  Dr.
Moorhead never examined Ms. Reardon and only reviewed the records sent to him by
Prudential. Even though Dr. Moorhead's opinion differed drastically from plaintiff's treating
physician and vocational experts, Prudential chose not to obtain an independent medical exam or
to obtain its own functional capacity evaluation of plaintiff to determine her ability to work.  The
Sixth Circuit has stated:

> [W]hile we find that [the defendant's] reliance on a file review does not, standing
> alone, require the conclusion that [the defendant] acted improperly, we find that
> the failure to conduct a physical examination–especially where the right to do so
> is specifically reserved in the plan–may, in some cases, raise questions about the
> thoroughness and accuracy of the benefits determination.

*Calvert,* 409 F.3d at 295.

This is especially true where Dr. Moorhead's file review included credibility
determinations concerning plaintiff's subjective complaints without the benefit of a physical
examination. *Id*. at 296, 297 n.6 ("where, as here, however, the conclusions from that review
include critical credibility determinations regarding a claimant's medical history and
symptomology, reliance on such a review may be inadequate.").  In *Calvert*, the Sixth Circuit
held that the file review conducted was inadequate in part because the physician made credibility
determinations concerning the patient's subjective complaints without the benefit of a physical

examination. *Id*. at 296.  Similarly, in *Smith v. Continental Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006), the Court of Appeals held that a doctor's file review was inadequate because he made credibility determinations concerning the applicant's subjective complaints of pain without obtaining an independent medical examination to evaluate that pain. *Id*. at 263-64.  Where the plan administrator could have obtained an independent medical examination to evaluate the applicant's pain, but chose not to, that decision supports a finding that the disability determination was arbitrary. *Smith*, 450 F.3d at 264.

In the instant case, like *Calvert* and *Smith*, Dr. Moorhead's file review was inadequate because he made credibility determinations without the benefit of a physical examination of Ms. Reardon.  Dr. Moorhead questioned Ms. Reardon's credibility and suspected that she might be engaging in "symptom magnification." (AR 000133).  He cited to the report of "unsteadiness" in the FCE which he believed was not explained by plaintiff's diagnoses.  He also cited to the fact that Mr. Wickstrom, the evaluator, did not address the possibility that plaintiff's unsteadiness was a form of symptom magnification and that "Dr. Portugal noted 'give-away' inconsistent force generation on physical examination, which is one of the Waddell signs suggesting non-organic pain and would give additional to the possibility of symptom magnification." (AR 000133).  Dr. Moorhead further opined that "[m]yofascial pain[7], while uncomfortable, is very common in the general population and would not be expected to cause pain severe enough to

---

[7]"Myofascial Pain Syndrome" is classified under "Fibromyalgia," as one of "A group of common nonarticular disorders characterized by achy pain, tenderness, and stiffness of muscles, areas of tendon insertions, and adjacent soft tissue structures." The Merck Manual of Diagnosis and Therapy 481 (Mark H Beers, M.D. & Robert Berkow, M.D. eds., 17th ed.1999). The terms Myofascial Pain Syndrome and fibromyalgia have been used interchangeably. *See Alexander v. Barnhart*, 287 F. Supp.2d 944, *965 (E.D. Wisc. 2003); *Sharbaugh v. Apfel*, No. 99-CV-277H, 2000 WL 575632, at *1 n. 4 (W.D.N.Y. Mar. 20, 2000).

prevent Ms. Reardon from working" (AR 000133)[8], suggesting that Ms. Reardon's complaints of pain are exaggerated.

The import of Dr. Moorhead's letter to Prudential is that Ms. Reardon's exaggeration of her subjective complaints have colored the opinions of her treating physician and vocational experts.  Not only does Dr. Moorhead make credibility findings without the benefit of a physical exam, the omission of certain facts from the "Discussion" section of his letter to Prudential gives an impression of Ms. Reardon's credibility that is not born out by the evidence of record.  With regard to the single "give-away" finding cited in Dr. Portugal's May 2001 office note which Dr. Moorhead states may suggest symptom magnification, Dr. Moorhead fails to point out that there are five Waddell Signs on non-organic pain and the existence of only one such sign is not considered clinically significant.  *See* WADDELL G, MCCULLOCH JA, KUMMEL E, VENNER, RM: Nonorganic Physical Signs in Low-Back Pain. *Spine* 5:117-125, 1980 ("[A] finding of three or more of the five types is clinically significant.  Isolated positive signs are ignored."). (Doc. 31, Exh. 9).  In addition, Dr. Moorhead's suggestion of symptom magnification due to unsteadiness during the FCE ignores Mr. Wickstrom's reported finding that Ms. Reardon was "[v]ery cooperative and provided a great effort" in assessing the validity of her performance on testing during her functional capacities evaluation. (AR000142).  None of plaintiff's examining doctors reported or suggested that plaintiff was magnifying or exaggerating her symptoms.  Moreover, the fact that myofascial pain or fibromyalgia may be experienced by many people in the general population, as pointed out by Dr. Moorhead, does nothing to establish the degree to which

---

[8]While Dr. Moorhead admits that "an estimate [of the amount of pain and fatigue] is impossible" (Doc. 31, Moorhead depo. at 66) and that "it is difficult to estimate the degree of any pain which Ms. Reardon might have" (AR 000133), Dr. Moorhead  goes on to do just that, opining that plaintiff's fibromyalgia and osteoarthritis should not be severe enough to prevent her from working. (Doc. 31, Moorhead Depo. at 67).

*plaintiff* may be limited thereby.  *See Hawkins*, 326 F.3d at 919 ("The fact that the majority of individuals suffering from fibromyalgia can work is the weakest possible evidence that [the plaintiff] can, especially since the size of the majority is not indicated....").  The record contains no evidence that Dr. Moorhead is an expert in fibromyalgia or rheumatology, or that he or anyone else at Prudential consulted a specialist for more information.  "Such failure to consult with an appropriate medical specialist falls short of ERISA's requirements for a full and fair review."  *Atkinson v. Prudential Ins. Co. of America*, 2006 WL 1663832, *7 (E.D. Ark. 2006).  Dr. Moorhead's credibility findings, which are not based on any personal observation of Ms. Reardon and which are not supported by the record evidence, are highly suspect and evidence of bias.  Thus, Prudential's reliance on Dr. Moorhead's file review was inadequate. *Calvert*, 409 F.3d at 297.

Prudential attempts to distinguish *Calvert* and its progeny by arguing that unlike the medical expert in *Calvert*, Dr. Moorhead reviewed plaintiff's complete file and thoroughly described the records he reviewed in reaching his conclusions.  A similar argument was recently rejected by the Sixth Circuit in *Smith* where the Court of Appeals found significant the fact that the administrator declined to obtain an independent medical exam and chose instead to rely on the medical review of a non-examining doctor who made credibility findings solely on the basis of a file review:

> We agree that Kaplan [the reviewing doctor] does discuss objective medical findings in his peer review report[;] however, Kaplan also makes credibility findings concerning Smith's pain without the benefit of a physical exam. Here, as in *Calvert*, CCC has reserved the right to obtain an independent medical examination of a claimant. Following the ruling in *Calvert*, we consider CCC's decision to not require an examination as part of the arbitrary and capricious review, especially because Kaplan made credibility determinations concerning Smith's subjective complaints. CCC could have obtained an independent medical

33

> examination to evaluate Smith's pain. Their decision to not perform this
> examination supports the finding that their determination was arbitrary.

*Smith*, 450 F.3d at 263-64.

Thus, on the facts of this case, Prudential's failure to request an independent medical examination and/or functional capacity evaluation and reliance on the opinion of Dr. Moorhead to reject the contrary opinions of plaintiff's treating physician and vocational experts leads to the conclusion that Prudential's decision to deny benefits was arbitrary and capricious, particularly when Prudential's conflict of interest and Dr. Moorhead's bias are taken into account.  *See Smith*, 450 F.3d at 262-263; *Calvert,* 409 F.3d at 296.  Prudential's conflict of interests interfered with an objective view of the record and rendered its denial decision arbitrary and capricious.

In so holding, the Court notes it is not giving more credence to plaintiff's treating physician than to Prudential's independent medical examiner, as the Supreme Court has rejected the "treating physician rule" in ERISA cases.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Nonetheless, even the *Nord* Court held that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id*.  Here the Court finds that this is exactly what Prudential did by arbitrarily refusing to accept the opinions of plaintiff's physicians and vocational experts.  Here, Prudential did not credit reliable evidence when choosing to accept Dr. Moorhead's opinion over those of Dr. Gerke and the vocational experts who opined that plaintiff was unable to perform sedentary work.

Prudential's decision to deny benefits to this long-term employee is highly suspect.  As discussed above, Prudential was operating under a conflict of interest because it both determined eligibility and paid the benefits, and relied on the opinion of a biased reviewing physician to

deny benefits.  Against this backdrop, Prudential ignored or selectively considered the medical findings of doctors that showed disability in favor of its own non-examining reviewing physician who concluded that plaintiff was capable of sedentary to light work.  Taking all of these factors into consideration, the Court concludes that Prudential's decision to deny benefits was arbitrary and capricious.

### IV.  <u>Benefits are not Limited to 24 Months</u>

Contrary to Prudential's argument, there is evidence that plaintiff is unable to perform "any gainful occupation" as a result of the limitations imposed by her osteoarthritis, degenerative disc disease, and fibromyalgia, and benefits are not limited to 24 months under the Plan terms. Dr. Gerke's assessments (AR 000138, 000144, 000243, 000372), coupled with the reports of the two qualified vocational experts (AR 000143, 000149), demonstrate that Ms. Reardon is disabled from any gainful occupation.  Accordingly, the Court recommends that plaintiff's motion for judgment on the administrative record (Docs. 33) be **GRANTED**, and Prudential's motion for judgment on the administrative record (Doc. 37) be **DENIED**, and the case remanded for an award of benefits.

### IT IS THEREFORE RECOMMENDED THAT:

1.  Plaintiff's motion for judgment on the administrative record (Docs. 33) be **GRANTED**.

2.  Prudential's motion for judgment on the administrative record (Doc. 37) be **DENIED**.

3.  This matter be remanded for an award of benefits.

Date: 11/17/2006                                     s/Timothy S. Hogan
                                                    Timothy S. Hogan
                                                    United States Magistrate Judge

# UNITED  STATES  DISTRICT  COURT
## SOUTHERN  DISTRICT  OF  OHIO
### WESTERN  DIVISION


BETTY J. REARDON,
      Plaintiff,                                     Civil Action No. 1:05-cv-178

      vs.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,
      Defendant.                                (Dlott, J.; Hogan, M.J.)


### NOTICE TO PARTIES REGARDING FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **TEN (10) DAYS** after being served with a copy thereof.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **TEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).